UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ST. LOUIS HEART CENTER, INC., individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>    vs.<br><br>VEIN CENTERS FOR EXCELLENCE, INC.,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 4:12 CV 174 CDP<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

This action is before me on plaintiff St. Louis Heart Center, Inc.'s motion to

certify a class under the Telephone Consumer Protection Act, 47 U.S.C.

227(b)(1)(C). Heart Center alleges that defendant Vein Centers for Excellence,

Inc., a marketing firm that provides graphic design and other services to doctors,

sent "junk faxes" to Heart Center and thousands of others. Heart Center seeks to

represent the class of persons to whom Vein Centers sent these faxes in a class

action under Rule 23, Fed. R. Civ. P. Vein Centers opposes the motion for class

certification, arguing that, for many reasons, Heart Center's proposed class is

overbroad and unascertainable; that Heart Center is not an adequate class

representative; and that the TCPA's provision for minimum statutory damages is

unconstitutional.  I find that the proposed class, with some minor amendments, satisfies the requirements of Rule 23, and I will therefore certify the class.

I.    **Background**

Around 2007 or 2008, Vein Centers created form advertisements to be sent by fax.  From various third parties, Vein Centers had obtained lists of thousands of fax numbers belonging to doctors and medical centers.  Vein Centers sent the advertisements to fax broadcaster Westfax and instructed Westfax to send them out to the numbers on the lists.  Before sending the lists of numbers to Westfax, Vein Centers' marketing coordinator Misty Mitra manually removed the numbers of Vein Centers' existing customers.  Vein Centers did not call anyone on the lists to seek permission to send out the faxed advertisements, and it "solely determined" the target fax numbers to which the advertisements were sent.

Per Vein Centers' instructions, Westfax faxed the advertisements.  In total, Vein Centers hired Westfax to conduct 10 fax broadcasts, including one test.  In 2008, Westfax attempted to fax advertisements four times to a list of 6,758 vascular and general surgeons; once to a list of 1,854 OB/GYNs; once to a list of 879 dermatologists; and once to a list of vein doctors.[1]  It also faxed Vein Centers' advertisement on September 15, 2009 to two lists: the vascular and general

---

[1]  The total number of vein doctors is not in the record.

surgeons and a list of 5,884[2] cardiologists.  In sum, Westfax charged Vein Centers

for 35,212 "successful" transmissions.[3]

Plaintiff Heart Center is a corporation owned by cardiologist Ronald Weiss.

It received a faxed advertisement from Vein Centers in 2009 as part of the

cardiologist blast fax.  The advertisement contained the statement, "If you would

like to be removed from this fax list call [phone number] or fax back to [fax

number], with the word 'Remove' on it."  (Compl., Pl.'s Ex. 4, Doc. No. 5-4.)

## II.   Telephone Consumer Protection Act

Congress passed the TCPA in 1991, prompted by "[v]oluminous consumer

complaints about abuses of telephone technology."  *Mims v. Arrow Fin. Servs.*

*LLC*, 132 S. Ct. 740, 744 (2012).  The TCPA "bans certain practices invasive of

privacy and directs the Federal Communications Commission . . . to prescribe

implementing regulations."  *Id.*  The TCPA provides expressly for private lawsuits

(*see* 47 U.S.C. 227(b)(3)), over which state and federal courts have concurrent

---

[2]  According to the InfoUSA order confirmation form, Vein Centers purchased a list of 5,884 cardiologist offices including fax numbers, but according to the Westfax fax broadcast order form, Vein Centers requested that Westfax send advertisements to 5,885 cardiologists.  (Order Forms, Pl.'s Ex. A, Doc. No. 32-1, pp. 46-50.)  Only the number of successful transmissions is known.  There is a similar discrepancy in the number of vascular and general surgeons: 6,760 fax numbers were purchased, but Westfax only attempted 6,758 transmissions the four times it sent advertisements in 2008.  (*Id.*, pp. 45, 51, 52, 53, 58.)  It could be that Mitra manually removed two doctors before passing the list on to Westfax.  (*See id.*, p. 9, Mitra Dep. 30:13–31:9.)

[3]  Barry Clark, president of Westfax, stated in a declaration that Westfax bills only for a transmission "when the transmission of the content is completed without any interruption or termination during the transmission.  Westfax does not bill for fax transmissions that were sent but not completely received."  (Clark Dec., Pl.'s Ex. D, Doc. No. 32-4, p. 2.)

jurisdiction. *Mims*, 132 S. Ct. at 745. It provides that a "person or entity" may bring an action "based on a violation of this subsection or the regulations prescribed under this subsection" to enjoin such violation, recover damages, or both. 47 U.S.C. § 227(b)(3); *see also Nack v. Walburg*, 715 F.3d 680, 686–87 (8th Cir. 2013). It also permits state officials to bring an action on behalf of state residents. 47 U.S.C. § 227(e)(6)(A).

Among other things, the TCPA "proscribes sending unsolicited advertisements to fax machines" unless they meet certain exceptions. *Mims*, 132 S. Ct. at 745 (citing 47 U.S.C. § 227(b)(1)(C)). "The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

The TCPA "imposes, on anyone who sends an unsolicited fax advertisement, statutory damages of $500 per fax, which can be trebled if the court finds that the violation was willful or knowing." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 914 (7th Cir. 2011) (citing 47 U.S.C. § 227(b)(1)(C), (b)(3)); *see also Nack*, 715 F.3d at 683.

# III.    Class Certification Requirements

Under Rule 23(a) of the Federal Rules of Civil Procedure, a party seeking class certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (moving party must "affirmatively demonstrate his compliance with the Rule").

The party seeking certification also must show that one of the sets of criteria in Rule 23(b) are met. In this case, Heart Center seeks to certify a class under Rule 23(b)(3). Rule 23(b)(3) actions require a court to find that (1) the questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). To reach this second conclusion, a court considers (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against the class

members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. A district court considering class certification "must undertake a rigorous analysis that includes examination of what the parties would be required to prove at trial." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (internal quotation marks omitted).

## IV. <u>Discussion</u>

### A. <u>*The TCPA Permits Class Actions*</u>

Defendant Vein Centers argues that, for two reasons, the TCPA does not permit class actions. First, it states that the damages available under the TCPA ($500 to $1,500 per violation) are sufficient to incentivize individual plaintiffs to bring suit. Allowing class actions would, according to Vein Centers, create "an impermissible *double* economic incentive" to bring TCPA claims. (Def.'s Mem. in Opp., Doc. 36, p. 4.) Second, Vein Centers contends that by creating an avenue for a state official to bring a TCPA claim on behalf of a group of citizens, Congress intended to preclude private class actions.

In my Memorandum and Order dated March 14, 2012, I addressed both of Vein Centers' arguments. I stated then that I would reserve final judgment until a later stage in the case. However, at that time, I found nothing in the legislative

history of the TCPA suggesting that Congress intended to exclude private class actions. Vein Centers presents no new evidence to bolster its position. I continue to agree with the United States Court of Appeals for the Third Circuit, which discussed this issue in *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 94–95 (3d Cir. 2011).[4] The *Landsman* court concluded that whether "individual statutory damages of $500 to $1500 are enough to both punish offenders and spur victims" is a question for Congress, and a trial court's determination that such damages are adequate would be an inappropriate substitution of judicial judgment for that of Congress. *Id.* at 94.

Further, in *Califano v. Yamasaki*, 442 U.S. 682 (1979), the Supreme Court held that statutory language creating a cause of action for "any individual" was not enough to "indicate that the usual Rule providing for class actions is not controlling." Instead, the Court held that there would have to be an "express limitation of class relief" or a "clear expression of congressional intent" to exempt class actions. *Id.* at 699–700. Otherwise, the Federal Rules of Civil Procedure – including Rule 23 – govern an action. There is simply no such limiting language in the TCPA. As I stated before, neither the amount of damages available nor the

---

[4] The Third Circuit later vacated this decision in light of the Supreme Court's decision in *Mims*, 132 S. Ct. 740, then reinstated the majority of its opinion – including this section – in an order dated April 17, 2012. *Landsman & Funk PC*, No. 09-3105, 2012 WL 2052685.

creation of a right of action for state officials to bring claims on behalf of state

citizens is a clear or express limitation on class actions. Therefore, I find that class

actions are allowed under the TCPA.

**B.      _Plaintiff's Proposed Class Definition_**

In this case, Heart Center proposes that the class be defined as:

> All persons who, between January 15, 2008 and September 15, 2009, were
> sent one or more telephone facsimile messages by Westfax on behalf of
> Vein Centers for Excellence, Inc. that did not inform the fax recipient that he
> or she may make a request to the sender of the advertisement not to send any
> future facsimile advertisements and that failure to comply with the request,
> within 30 days, is unlawful.

**C.      _Ascertainability_**

As a preliminary matter, membership in a putative class must be

ascertainable by reference to some objective criteria. *See, e.g., Oshana v. Coca-*

*Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ("class definitions must be definite

enough that the class can be ascertained"); *Ad Hoc Comm. to Save Homer G.*

*Phillips Hosp. v. City of St. Louis*, 143 F.R.D. 216, 219 (E.D. Mo. 1992) ("If a

class is so vague that it is not susceptible to ready identification, problems may

arise regarding the provision of notification to class members, the binding effect of

any judgment rendered in the case and the general concerns of propriety of an

overly large class.").

Vein Centers argues that, for several reasons, using the proposed definition would lead to an overbroad and unascertainable class. Most fundamentally, although it agrees that a list of fax numbers is objective in nature, it argues that there is no reliable basis for converting those fax numbers into names. Further, the fax number lists Vein Centers used are now six years old, which it contends would make it impossible to track down putative class members.

To support this argument, Vein Centers submitted an affidavit from paralegal Ellen Brown-Montgomery. (Def.'s Ex. 4, Doc. 36-4.) In the affidavit, Brown-Montgomery stated that she took a sizeable sample of the fax numbers and copied them into the LexisNexis Accurint database of public records. Her search revealed that, for 27% of the fax numbers, there were no records available. For an additional 30% of the fax numbers, the available contact information did not match the identity information from the Westfax lists.

In response, plaintiff Heart Center provided an affidavit from Matt Graves, chief data officer of Infogroup, Inc., a data and marketing services company. (Pl.'s Ex. A, Doc. 40-1.) Infogroup, otherwise known as InfoUSA (*see* Pl.'s Ex. A, Doc. 32-1, Mitra Dep. 16:25–17:1), provided to Vein Centers several of the fax number lists at issue in this case. Graves averred that, if given a list of fax numbers, his company could match those numbers to persons and their addresses. He also

stated that his company could provide updated contact information for those persons, as well as determine whether the old fax numbers were now assigned to someone else. In part, the problems identified by Brown-Montgomery are alleviated by the Graves' affidavit because, as he stated, his company maintains its own contact information and would not have to rely on the Accurint database.

Further, the fax numbers lists contain some other contact information. Mitra testified that Vein Centers purchased some lists in Excel spreadsheet form, and she was able to sort the numbers by doctor name in order to remove Vein Centers' current clients. (Mitra Dep. 29:13-17; 31:13-16.) In fact, the list provided by VeinDirectory.org included doctors' names, addresses, links to email addresses and websites, and information about each facility. (*Id.* 55:20–58:1, 61:16-18.) All in all, I find that the Graves affidavit, as well as the incomplete contact information attached to the fax number lists, is sufficient at this stage to address Vein Centers' concerns about the fax numbers being outdated or inherently impossible to match with putative class members.

Vein Centers also points out that Westfax's "success rate" was only approximately 80%. That is, about one-fifth of the intended recipients never received faxes at all. Vein Centers suggests that the putative class is therefore

impermissibly broad because it necessarily includes persons who never received its faxes.

The TCPA, however, makes it unlawful to "send" an unsolicited fax advertisement. 47 U.S.C. § 227(b)(1)(C). Applying the plain language of the statute, several courts have found that proof of receipt is not a required element of a TCPA claim. *See, e.g., Hinman v. M & M Rental Cntr., Inc.*, 596 F. Supp. 2d 1152, 1159 (N.D. Ill. 2009) (reading a "receipt" requirement into the TCPA "imports elements that neither Congress, nor the FCC, nor any soundly reasoned authority has stated are part of a TCPA claim"); *Jackson Five Star Catering, Inc. v. Beason*, No. 10-10010, 2013 WL 5966340, at *6 (E.D. Mich. Nov. 8, 2013); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, No. 1:09CV1162, 2013 WL 3654550, at *4 (W.D. Mich. July 12, 2013); *A Fast Sign Co., Inc. v. Am. Home Servs., Inc.*, 734 S.E.2d 31, 32 (Ga. 2012); *Critchfield v. Taranto Grp., Inc.*, 263 P.3d 767, 778 (Kan. 2011) (harm from unsolicited faxes "extends to intended recipients" as "targets of mass fax advertising" because, for example, a business might have turned its fax machine off to stem the flow of junk faxes); *see also Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 281 F.R.D. 327, 331 (E.D. Wis. 2012); *Columbia Cas. Co. v. Hiar Holdings, L.L.C.*, No. 07SL-CC00520, 2011 WL 8826010, at *14 (Mo. Cir. Ct. Nov. 29, 2011) ("the TCPA requires only

that a plaintiff establish that a fax was sent") (judgment affirmed by Mo. Sup. Ct. on Oct. 31, 2013).  Therefore, based on the plain language of the statute, including in the class all persons who were sent a fax – even if they never received it – does not render the class unascertainable or overbroad.

Vein Centers also points out that the lists may include persons who do not own (but rather just use) a fax machine to which its fax was sent.  It argues that non-owners do not have standing to sue under the TCPA.  To support this argument, Vein Centers relies on *Machesney v. Lar-Bev of Howell, Inc.*, No. 10-10085, 2013 WL 1721150 (E.D. Mich. 2013).  In *Machesney* and two companion cases, the Eastern District of Michigan examined the legislative history of the TCPA and concluded that only fax machine owners had statutory standing to sue. *Id.* at *14–*18.

Unlike Article III standing, "statutory standing goes to the merits" of a claim.  *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012).  "Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury."  *Id.* (bracketed text omitted).  In all matters of statutory interpretation, a court must first look at the plain text of the statute at hand.  *See United States v. Talley*, 16 F.3d 972, 975 (8th Cir. 1994) (To determine who has

standing under a statute, a court begins "with its plain language"). "If unambiguous, the plain text is ordinarily considered conclusive "in the absence of a clearly expressed legislative intent to the contrary." *Id.* (quoting *U.S. Marshals Serv. v. Means*, 741 F.2d 1053, 1056 (8th Cir. 1984)).

In this case, the TCPA provides that a "person or entity" may bring an action "based on a violation of this subsection or the regulations prescribed under this subsection" to enjoin such violation, recover damages, or both. *Id.* § (b)(3). There is no language in the TCPA indicating that only fax machine owners have a private right of action. Because the statute is not ambiguous, there is no need to turn, as the *Machesney* court did, to the legislative history of the TCPA.

This result – not limiting the TCPA putative class to fax machine owners – comports with common sense. Courts have consistently found that the TCPA was intended to address at least two injuries: the misuse of ink and paper by junk advertisers and the misappropriation of the fax line, preventing legitimate faxes from being sent or received. *See Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 654 (8th Cir. 2003) (citing hearing testimony), 657 n.5 (unlike live solicitations, faxed advertisements "were believed [by Congress] to have heightened intrusiveness because they are unable to interact with the customer except in preprogrammed ways" (internal quotation marks omitted)). A party

other than a fax machine owner could be, and often is, responsible for supplying ink and paper or paying a telephone company for use of a fax line and should not be excluded from the putative class.

However, Vein Centers worries that, by using the proposed definition, it might end up being liable to multiple parties for each fax it sent. Although conceivable, such a result would not increase Vein Centers' overall liability. The TCPA sets statutory damages at between $500 and $1500 per *violation*, not per person. 47 U.S.C. § 227(b)(3).

Finally, Vein Centers argues that the class definition, as written, may include persons whose fax machines do not automatically print faxes and who, therefore, may not have suffered a loss of ink and paper. The TCPA makes it unlawful to "use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless certain exceptions apply. 47 U.S.C. § 227(b)(1). It defines "telephone facsimile machine" as equipment that has the *capacity* (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper. 47 U.S.C. § 227(a)(3) (emphasis added). The FCC has clarified that this definition includes computers and computerized fax

servers that may not automatically print upon receipt. *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 200 (July 3, 2003). This comports with the definition as written. In addition, the Eighth Circuit has acknowledged that the "harms of unsolicited fax advertising" are not necessarily "eliminated by technological changes," including an increase in the number of computer programs that convert faxes to PDFs: "unsolicited fax advertising interferes with company switchboard operations and burdens the computer networks of those recipients who route incoming faxes into their electronic mail systems." *Am. Blast Fax*, 323 F.3d at 655.

In sum, I find that the class, as proposed by Heart Center, is ascertainable. Next, I will turn to the Rule 23 requirements for certification. I will address Vein Centers' remaining objections in the appropriate sections.

**D.      *Numerosity***

A class may not be certified unless it is so large that joinder of all class members would be "impracticable." Fed. R. Civ. P. 23(a)(1); *see also Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559–60 (8th Cir. 1982). It is undisputed that the proposed class contains thousands of doctors and medical centers to whom Vein

Centers directed Westfax to send advertisements.  I find that plaintiff has met the numerosity requirement of Rule 23(a).

## E.   *Commonality*

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  The plaintiff must show that "a classwide proceeding will 'generate common answers apt to drive the resolution of the litigation.'"  *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011) (quoting *Dukes*, 131 S. Ct. at 2551).  In determining "whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings."  *Blades*, 400 F.3d at 566.

In this case, each of Vein Centers' relevant actions was directed toward – at least – a sizeable subset of the putative class: it procured long lists of fax numbers, created form advertisements, and directed Westfax to transmit those advertisements to hundreds or thousands of fax machines simultaneously.  The content of each fax was virtually the same.  Whether or not those advertisements comport with the TCPA and the associated rules promulgated by the FCC is one of many examples of questions that will be answered on a classwide basis.  I will examine whether those questions predominate when I address the Rule 23(b) class certification requirements.

***F.***     ***Typicality***

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  This prerequisite can be met if the claims or defenses all stem from a single event or if the plaintiff can demonstrate that the class shares the same or similar grievances.  *See Paxton*, 688 F.2d at 562. "The burden of showing typicality is not an onerous one." *Id.* Nonetheless, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006).

Here, Vein Centers engaged in a standardized course of conduct vis-à-vis the putative class members, including Heart Center, by faxing advertisements (via Westfax) to thousands of people at a time.  Heart Center, whose number came from the same source as other class members and who was sent a fax at the same time as others, is typical.

Vein Centers argues that Heart Center is not a member of the class it seeks to represent because the faxed advertisement it received included an opt-out notice. Vein Centers complains that a class definition should not be "premised entirely on an obscure subsection of a federal regulation" that requires opt-out notices to contain specific language.  (Def.'s Mem. in Opp., Doc. 36, p. 13.)  *See* 47 C.F.R. §

64.1200(a)(3)(iii)(B) (notice must state it is unlawful to fail to comply within 30 days with a recipient's request not to send any future advertisements).[5]

Unfortunately for Vein Centers, this is not the law. The TCPA creates a private right of action based on a violation of the statute *or* the regulations promulgated under its authority. *See Nack*, 715 F.3d at 685, 686. That makes Heart Center, whose advertisement it argues did not include a compliant opt-out notice, a member of the proposed class. Vein Centers argues that premising class membership on "such a minute detail" would mean that the "exact wording of the notice on all 35,212 faxes" must be reviewed. (Def.'s Mem. in Opp., Doc. 36, p. 13.) But this, at most, is a hypothetical problem: there is no evidence that Vein Centers created original content for each fax. If Vein Centers produces evidence that any of those notices included the 30-day language, division of the class into subclasses may be appropriate. At this stage, the evidence tends to show that the advertisements were sent out *en masse* with virtually identical content and that Heart Center's claim is typical of the class.

Vein Centers points to two terms in the proposed class definition that it believes might create confusion. First, it argues that the proposed class is limited

---

[5] This subsection is where the requirement appeared in the two versions of the regulation that were effective during the class period. *See* 71 Fed. Reg. 75,122 (Dec. 14, 2006); 73 Fed. Reg. 67,419 (Nov. 14, 2008). It has since been renumbered.

to "persons," and Heart Center is not a "person." I will amend the definition to add "or entities." Second, Vein Centers takes issue with "and," which it reads as a disjunctive. That is, it argues that, as written, the proposed class definition would exclude persons who were sent faxes that *either* informed "the fax recipient that he or she may make a request to the send of the advertisement not to send any future facsimile advertisements" *or* "that failure to comply with the request, within 30 days, is unlawful," and only faxes that included neither instruction would qualify. I do not believe this is a natural reading of the proposed definition, but to clarify, I will add "both" as plaintiff Heart Center suggests.

Therefore, the class definition will be amended to read:

> All persons *or entities* who, between January 15, 2008 and September 15, 2009, were sent one or more telephone facsimile messages by Westfax on behalf of Vein Centers for Excellence, Inc. that did not inform the fax recipient *both* that (1) he or she may make a request to the sender of the advertisement not to send any future facsimile advertisements and that (2) failure to comply with the request, within 30 days, is unlawful.

## G.     *Adequacy of Representation*

To satisfy the adequacy requirement, plaintiff must establish that: (1) the class representative's interests are not antagonistic to those of unnamed class members, and (2) the plaintiff's counsel must be fully competent to prosecute the action as a class action. *Linquist v. Bowen*, 633 F. Supp. 846, 859 (W.D. Mo. 1986); *see also Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). To

– 19 –

ensure adequacy of representation, the court should ask whether a class representative has "common interests with the members of the class" and whether it "will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562–63.

Vein Centers argues that Heart Center is not an adequate class representative because of two provisions in the representation agreement between Heart Center and its counsel. One provision states that counsel will consult plaintiff before recommending a settlement. It goes on, "You are entitled to object to the settlement if you do not agree with our recommendation to settle" and provides that Heart Center "accepts that any resolution of the lawsuit, such as by settlement or dismissal, must be in the best interests of the class as a whole and must be approved by the Court." The other provision gives class counsel authority to dismiss the case or withdraw as counsel if "for any reason" it deems the case is not economically or meritoriously feasible to pursue further. (*See* Def.'s Ex. 5, Doc. No. 36-5, p. 2.) Neither provision demonstrates that Heart Center will not adequately represent the interests of the class nor that its interests are somehow antagonistic to the interests of the class. Indeed, these provisions informed Heart Center that if its interest diverges from that of the class, it may object and discontinue serving as class representative.

Further, Heart Center's owner, Ronald Weiss, made himself available for a deposition. He testified that he has received hundreds of unsolicited fax advertisements, which he collected and sent to his attorney. When asked why, he stated, "To try and stop this practice because I – I understand that it is wrong, that it is illegal, and I would like to stop this practice of receiving unsolicited faxes." (Pl.'s Ex. E, Doc. 32-5, Weiss Dep. 31:17–32:8.) Defendant's counsel also questioned Weiss about what duties he had as a class representative, and Weiss testified that he had an obligation to "make decisions that are in the best interest of the class rather than any decisions that would be in the best interest of myself personally." (*Id.*, 60:16-21.) When defendant's counsel asked Weiss why Heart Centers filed class actions rather than individual claims, Weiss testified, "Because I feel that that is the most effective way to stop this practice and to obtain statutory damages provided under the TCPA statute for the individuals who were sent faxes." (*Id.*, 67:1-12, *see also id.* 69:15–71:24.) From his testimony, it appears Weiss sufficiently understands Heart Center's duties as class representative and is vigorously pursuing the interests of the class.

Vein Centers also argues that there is "no legal basis" for Heart Center to represent persons and entities who were sent faxes on dates other than September 15, 2009. It contends that plaintiff "has not presented any evidence to show that

the nine groups of fax transmissions should be lumped together into one class."

(Def.'s Mem. in Opp., Doc. 36, p. 17.) I disagree. Heart Center has produced

evidence that tends to show Vein Centers engaged in the same course of conduct

nine times, including faxing advertisements identical in all relevant respects, and –

in some cases – to the same lists of fax numbers. As I stated previously, if Vein

Centers produces some evidence to the contrary, it may move to de-certify the

class or to separate it into subclasses.

## H.    *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." *Amchen Prods.,*

*Inc.*, 521 U.S. at 623. The standard for certification imposed by Rule 23(b)(3) is

more demanding than the commonality requirement of Rule 23(a). The nature of

the evidence necessary to resolve a question determines whether that question is

common or individual. If, to make a prima facie showing on a particular issue,

plaintiffs will need to present evidence that varies from one class member to the

next, then the issue raises an individual question. If the same evidence can suffice

for each member of the class on an issue, then it becomes a common question.

*Blades*, 400 F.3d at 566; *see also Evans v. Am. Credit Sys., Inc.*, 222 F.R.D. 388,

396 (D. Neb. 2004) ("Implicit in the satisfaction of the predominance test is the

notion that the adjudication of common issues will help achieve judicial economy.").

Here, I find that common questions predominate over individual questions. There is evidence that Vein Centers obtained the fax numbers at issue in long lists from a handful of sources and created form advertisements that contained essentially identical opt-out language. Whether that language complies with the TCPA and its applicable regulations is a common question that can be answered on a classwide basis. At present, I have no reason to believe that the resolution of any individual issues will consume more time or resources than the resolution of common issues. Accordingly, predominance is met.

Heart Center proposes representing a nationwide class. Vein Centers argues that nationwide treatment is inappropriate because some states limit class actions. Although it acknowledges that the TCPA is a federal statute, Vein Centers points to the TCPA's unusual language allowing a person or entity to "bring [an action] in an appropriate court of [a] State" only "if otherwise permitted by the laws or rules of court of [that] State." 47 U.S.C. § 227(b)(3). Vein Centers contends that certain states do not allow class actions and that persons or entities residing in those states should be excluded from the class.

Before the United States Supreme Court decided *Mims v. Arrow Financial Services, LLC*, the circuits were split over whether federal courts had subject-matter jurisdiction over TCPA cases, and if so, what type of jurisdiction it was. In *Mims*, the Supreme Court held that federal courts had federal-question jurisdiction over TCPA claims. 132 S. Ct. at 749. As such, the TCPA "furnishes the substantive rules of decision," *id.*, and the Federal Rules of Procedure – including Rule 23 – provide the procedural rules governing adjudication of the claim.

The District Court of New Jersey – one of the states whose residents Vein Centers proposes excluding from the class – recently examined this issue. *Fitzgerald v. Gann Law Books, Inc.*, No. 11CV4287, 2013 WL 3892700, at *4 (D. N.J. July 29, 2013). The *Fitzgerald* court asked, "does TCPA itself command application of state law? And if there were such a specific statutory command, would it trump Rule 23 . . . ?" *Id.* (emphasis and internal citation omitted). The court held:

> To the extent those questions might remain open, I answer them in the negative. There is no statement in TCPA sufficiently explicit to persuade me that Congress intended to supplant the well-established principle that the Federal Rules of Civil Procedure reign supreme in a federal court action based on federal law. All TCPA actually says on this issue is that a state court cause of action must comport with state law.

*Id.* Relying on *Mims* and *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the court continued:

> The underlying principle of *Mims* is that TCPA does not limit the availability of remedies in federal court. And *Shady Grove* holds that, even where a federal-court plaintiff asserts a state-law cause of action, Rule 23 may permit class-wide relief where state law would deny it. Put together, these authorities imply that, in a federal-court TCPA case, class action eligibility is governed by Rule 23, not state law.

I agree with the *Fitzgerald* court's reasoning. A nationwide class is appropriate in this case.

## I.    *Superiority*

The second prong of the Rule 23(b)(3) type of class action requires the class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." The Supreme Court has stated that the policy consideration behind Rule 23(b)(3) is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. Factors relevant to a court's inquiry into superiority include: the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against the class members; the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and the likely difficulties in managing a class action.  *See* Fed. R. Civ. P. 23(b)(3)(A)-(D).

In this case, there is no evidence that other duplicative litigation is ongoing. Because the statutory damages available to each individual class member are small – at most $1500 per violation – it is unlikely that the class members have interest in individually controlling the prosecution of separate actions.  This action involves thousands of plaintiffs, each with a relatively small, nearly identical claim, who might not otherwise seek or obtain relief absent a class action.  This court will only need to apply federal law, not multiple state laws.  Although there may be some administrative tasks for the parties, such as matching fax numbers to updated contact information, that is not enough to outweigh the benefits of treating these claims all together.  All in all, a class action is superior to other methods of adjudicating this controversy.

Vein Centers argues that I should not certify a class because if it does not prevail, it might have to pay a substantial sum.  Citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), Vein Centers contends that the TCPA codifies constitutionally excessive damages for each violation and that aggregating the claims "only compounds the magnitude of the constitutional violation and delays Defendant's opportunity to seek redress."  (Def.'s Mem. in Opp., Doc. 36, p. 18.)

According to Vein Centers, it would be a "judicial punt" to ignore this "constitutional deficit" at this stage of the case. (*Id.*, p. 19.)

I disagree. *BMW* is not particularly on point. In that case, the United States Supreme Court found that a large punitive damages award violated the defendant's due process rights. *Id.* at 574–75. Punitive damages are unique in part because they impose a greater penalty than may be evident from reading a prohibitory statute, and therefore, a potential lawbreaker may not have received "fair notice" of "the severity of the penalty." *Id.* at 574.

Here, punitive damages are not at issue. Whether Vein Centers *considers* the statutory damages available under the TCPA to be punitive is irrelevant. The $500 to $1500 award per violation is written plainly in the statute, so whether Vein Centers had notice of their availability is not in question. *See also Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012) ("The Supreme Court has never held that the punitive damages guideposts are applicable in the context of statutory damages."); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 881 (8th Cir. 2005) (for purposes of insurance coverage, TCPA statutory damages are not a "penalty"). In short, the potential for a large statutory damages award should not prevent class certification if it is otherwise appropriate, as it is in this case. *See Roberts v. Source for Public Data*,

No. 2:08CV4167, 2009 WL 3837502, at *6–*7 (W.D. Mo. Nov. 17, 2009) (granting class certification despite defendant's concern over large damages award and citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006)).

## V.     Conclusion

Based on the foregoing, I will grant Heart Centers' motion for class certification and amend the class definition as stated above.  I will set a status conference with counsel to discuss class notification and scheduling issues.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's amended motion to certify class [# 31] is granted, with the two minor amendments set forth above.

**IT IS FURTHER ORDERED** that there will be a supplemental telephone scheduling conference on **Thursday, January 23, 2014 at 1:30 p.m.** to discuss class notification and scheduling issues.  Plaintiffs' counsel is responsible for placing the call to my chambers at 314-244-7520 after assuring that all necessary counsel are on the line.  The parties shall file a joint memorandum no later than **January 17, 2014** setting out the issues for discussion at the status conference, as well as any areas of agreement and disagreement between the parties, and a proposed schedule for class notification and discovery for the remainder of the

case. All proposed orders for my consideration at the status conference shall be

filed by **January 17, 2014**.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 11th day of December, 2013.